# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Matthew Prow,

                    Plaintiff,

v.

Tom Roy, John King, Sandra O'Hara,
Steve Hammer, Mary McComb, Carol
Krippner, Regina Stepney, Lieutenant Lindell,
and Sergeant Hillyard,

                    Defendants.

**Case No. 15-cv-3857 (PAM/SER)**

**REPORT
AND RECOMMENDATION**

---

STEVEN E. RAU, United States Magistrate Judge

This matter comes before the undersigned on the parties' cross motions for summary judgment [Doc. Nos. 91, 107] and Plaintiff Matthew Prow's ("Prow") Motion for Temporary Restraining Order [Doc. No. 115].[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that: Defendants Roy, King, O'Hara, Hammer, McComb, Krippner, Stepney, Lindell, and Hillyard's (collectively, "Defendants") Motion for Summary Judgment be granted in part and denied in part; Prow's Motion for Summary Judgment be denied; Prow's Motion for Temporary Restraining Order be denied as moot; and this case be dismissed.

## I.    BACKGROUND[2]

---

[1]    This is Prow's third motion requesting a temporary restraining order. *See also* (Mot. for TRO & Prelim. Inj.) [Doc. No. 31]; (Mot. for TRO & Prelim. Inj.) [Doc. No. 43].

[2]    This Court only addresses the factual and procedural background relevant to the Court's analysis on the issues before it. For example, this Court does not address Prow's other motions requesting a temporary restraining order and his Motions to Compel Discovery [Doc. Nos. 38 and 125].

On February 22, 2016, Prow filed his Amended Complaint alleging violations of 42 U.S.C. § 1983. (First Am. Compl., "Am. Compl.") [Doc. No. 17]. Prow claims violations of his First and Fourteenth Amendments rights when Defendants: denied him books, images, and hobby craft supplies; impeded his attempts to exhaust his administrative remedies; mishandled his grievances; acted in violation of established policies; and retaliated against him for exercising his rights. (*Id.* ¶¶ 2, 10–18). Prow's allegations arise under application of the Minnesota Department of Correction's ("DOC"): Contraband Policy 301.030, prohibiting possession of sexually explicit materials; Hobby Craft Policy 204.047, limiting access to certain hobby craft items; and Mail Policy 302.020 prohibiting the inclusion of self-addressed-stamped-envelopes ("SASE") in outgoing mail. *See* (*id.*). Prow seeks an injunction prohibiting: the confiscation of purchased hobby craft supplies; confiscation of images that Prow deems to be "artistically contextual nudity"; and the application of the DOC's policy against the "use of Self-Addressed Stamped Envelopes." (*Id.* ¶¶ 10.b, 32–35).

Prow also seeks compensation for alleged retaliatory actions, including being placed in segregation and exposure to "stress responses" that caused "long term heart damage," (*Id.* ¶ 22); *see also* (*id.* at 13–14), and punitive damages for Defendants' "repeated and demonstrably callous indifference . . . as a matter of general practice." (*Id.* ¶ 24); *see also* (*id.* at 14).

On November 1, 2016, Defendants filed their Motion for Summary Judgment. Defendants raise numerous arguments why their Motion for Summary Judgement should be granted. In particular, Defendants argue that the DOC's policies regarding access to art supplies, and prohibitions against nudity and SASEs do not violate the First Amendment because the policies are both facially valid and valid as applied to Prow. *See* (Defs.' Mem. in Supp. of Their Mot. for Summ. J., "Defs.' Mem. in Supp. of Mot. for Summ. J.") [Doc. No. 92 at 10–31].

Defendants also argue that they have not violated Prow's Due Process rights and have not subjected Prow to cruel and unusual punishment as prohibited under the Eighth Amendment. *See* (*id.* at 31–35). Lastly and alternatively, Defendants assert: that they are not liable for damages or "retroactive injunctive relief" in their official capacities on the following bases: (1) the immunity afforded states under the Eleventh Amendment; (2) they are not liable for damages for mental or emotional damages under the Prison Litigation Reform Act ("PLRA"); (3) that claims against Defendant Roy should be dismissed because he had no personal involvement with the matters alleged in the Amended Complaint; and finally, qualified immunity shields them against any alleged constitutional violations. *See* (*id.* at 7–9, 35–36).

On December 14, 2016, Prow filed his Motion for Summary Judgment.[3] Prow asserts numerous arguments related to various policies that his Amendment Complaint implicates. With respect to Contraband Policy 301.030, Prow asserts the policy: is overbroad; is not rationality related to penological security; is arbitrary; is an impermissible content-based restriction; does not provide review according to the standard espoused in *Thornburgh v. Abbott*, 490 U.S. 401 (1989); and is unconstitutional as applied to Prow. *See* (Mem. of Law in Supp. of Pl.'s Second Motion for Summ. J., "Prow's Mem. in Supp. of Mot. for Summ. J.") [Doc. No. 108 at 10–25]. With respect to Hobby Craft Policy 204.047, Prow asserts the policy: is vague; its restrictions are an exaggerated response to prison security; is not rationally related to proffered penological

---

[3]    Prow's First Motion for Summary Judgment was dismissed without prejudice. *See* (Mem. & Order Dated Sept. 6, 2016) [Doc. No. 88]. In consideration of Prow's status as an inmate, Defendants agreed "that [Prow] may refer to [his] first declaration without having to refile as long as [he] made specific references [to the first declaration and attached exhibits]." (Decl. of Matthew Prow in Supp. of Second Mot. for Summ. J., "Prow's Second Decl.") [Doc. No. 110 at 3]. In support of Prow's Motion for Summary Judgment currently before the Court, Prow resubmitted his first declaration, which references his previously submitted exhibits. *See generally* (Decl. of Matthew Prow in Supp. of Second Mot. for Summ. J., "Prow's First Decl.") [Doc. No. 109]. Thus, the Court considers the exhibits attached to Prow's First Declaration [Doc. Nos. 64-1 to 64-32] when analyzing the pending Motions for Summary Judgment.

interests; and generally fails constitutional muster under *Turner v. Safley*, 482 U.S. 78 (1987). (*Id.* at 25–36). Prow asserts that the prohibition against SASEs in Mail Policy 302.020 violates his First Amendment rights because the ban of SASEs "hinders access to legal services, communication with others, and protected expression." *See* (*id.* at 38–39).[4]

On December 16, 2016, Prow filed the instant Motion for Temporary Restraining Order. (Mot. for TRO). In particular, Prow asserts that he "purchased from the Clerk's office copies of ECF No. 99 and its attached exhibit c." (Mem. in Supp. of Mot. for TRO) [116 at 1]. Prow further states that "[p]ursuant to mail procedure" the copies of the exhibits were reviewed by prison staff, classified as contraband on the basis of their sexually explicit nature, and confiscated. *See* (*id.*). Prow requests a temporary restraining to prevent the Defendants from disciplining him for requesting the contraband and an order to show cause as to "why Defendants should not be required to provide unredacted versions of all filings they have made with the Court." (*Id.* at 1–2).

Prow filed his Response to Defendants' Motion for Summary Judgment on February 15, 2017. *See* (Pl.'s Resp. to Defs.' Mot. for Summ. J. "Resp. to Defs.' Mot. for Summ. J.") [Doc. No. 147].[5] In response, Prow raises numerous arguments relating to the prohibition of sexually explicit material under Contraband Policy 301.30, including: the policy acts as a blanket ban; Defendants' proffered intent is inconsistent with the "true intent"; the policy produces unreasonable results; no exceptions to the policy exist; Defendants' "featuring" standard is

---

[4]     Prow also "voluntarily dismisses" his Eighth Amendment claims. (*Id.* at 8). But as will be discussed below, this was likely in response to Defendants' arguments directed thereto, as the Court cannot identify allegations in Prow's Amended Complaint that reasonably implicate the Eighth Amendment.

[5]     Prow submitted his Response to Defendants' Motion for Summary Judgment on February 15, 2017, but it was not docketed until February 21, 2017. *See* (Resp. to Defs. Mot. for Summ. J.).

arbitrary, vague, and does not match the proffered intent; the banned images do not create a hostile work environment; reducing mail volume is a "disingenuous argument"; and alternatives exist to the established policies that comport with Defendants' proffered interests. *See* (*id.* at 2–13). Likewise, Prow raises numerous arguments regarding the restriction of certain hobby craft items under Hobby Craft Policy 204.047, including: Defendants mischaracterize Prow's challenge to the policy; Defendants have failed in their burden justifying their restriction; the policy fails under *Turner*; and Defendants' allowance of some water-mixable oil paints does not cure the underlying constitutional violation. *See* (*id.* 13–25). With respect to Mail Policy 302.020, Prow argues that Defendants have not been truthful regarding the rationale behind the policy and the SASE is not a content-neutral restriction. *See* (*id.* at 25–28).

On February 17, 2017, Defendants filed their response to Prow's Motion for Summary Judgment. (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J., "Defs.' Resp. to Mot. for Summ. J.") [Doc. No. 145]. In response, Defendants re-emphasize the same general points made in their Motion for Summary Judgment. *See generally* (*id.*). Thus, the motions are fully briefed and ripe for consideration.

## II.    DISCUSSION

### A.    Motions for Summary Judgment

#### 1.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986) (emphasis omitted). "[A] dispute about a material fact is genuine if a reasonable jury could return a verdict in favor of either party." *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988). The court views the evidence and makes all reasonable inferences in favor of the nonmoving party. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 474 (8th Cir. 2005).

To support its argument, the moving party must cite to record materials or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).

### 2.     Analysis

The Court first addresses Defendants' Motion for Summary Judgment in light of Prow's Amended Complaint and the record evidence before the Court, including the materials Prow filed in support of his Motion for Summary Judgment. Based on its analysis, this Court recommends that Defendants' Motion for Summary Judgement be granted in part and denied in part, and that this case be dismissed. As a result, Prow is not entitled to judgement as a matter of law, and this Court recommends that his Motion for Summary Judgment be denied.

First, the Court will address Defendants' arguments directed to the merits of the case. Namely, Defendants asserts that they have not violated Prow's constitutional rights under the First, Eighth, and Fourteenth Amendments and that they are protected from any potential liability from qualified immunity. *See* (Defs.' Mem. in Supp. of Mot. for Summ. J. at 10–31, 35–36). Because this Court decides Defendants' Motion for Summary Judgment on the merits, it does not provide alternative analysis on Defendants' assertions that are arguably collateral to the merits of

the case: Defendants in their official capacities are immune from damages and retroactive injunctive relief; and the PLRA bars claims for damages on the basis of alleged mental or emotional distress. *See* (Defs.' Mem. in Supp. of Mot. for Summ. J. at 7–9).[6]

### a.    First Amendment Claims

Prow's challenges to Contraband Policy 301.030, Hobby Craft Policy 204.047, and Mail Policy 302.020 implicate the First Amendment and are analyzed under *Turner.* 482 U.S. at 89. A "regulation is valid if it is reasonably related to legitimate penological interests." *Id.* To determine whether a regulation is reasonably related to legitimate penological interests, courts employ a four-part test: (1) whether a "valid, rational connection" exists "between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the [constitutional] right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives."[7] *Id.* at 89–90.

As an initial matter, many of Prow's arguments do not dispute facts (e.g., whether something was or was not confiscated), but instead are directed to the professional judgment of the Defendants in administering their policies and establishing the criteria for violation of the policies. *See, e.g.*, (Pls.' Resp. to Mot. for Summ. J. at 5) (alleging that the sculpture "Vampira" is not arousing, and asserting that Defendant McComb would allow the "Venus de Milo" statute on the basis of her assessment that it is not arousing but prohibit that "Vampira" statute on that

---

[6]    Because this Court concludes that Prow has not established constitutional violations, it does not address Defendants arguments regarding whether certain Defendants were personally involved in the decisions that gave rise to this litigation.

[7]    For brevity, this Court recites the *Turner* factors here only, but references them throughout its analysis.

basis of her assessment that it is arousing); *see also* (Prow's Mem. in Supp. of Mot. for Summ. J. at 13) ("Defendant McComb has previously stated that an image of the statute of 'Venus de Milo' would not be a security risk, and allowed Plaintiff to possess it, when under the policy it was defined as contraband."); (Prow's Mem. in Supp. of Mot. for Summ. J. at 17) ("In practice, the 'featuring' version of the policy often wasn't properly applied . . . ."). In this regard, the Court "must distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (plurality opinion). As to the later, deference is accorded to prison authorities. *Id.* (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003)).

In other words, many of Prow's arguments are an attempt to urge this Court to "decide how well the prison officials applied their own policy." *Wickner v. McComb*, No. 09-cv-1219 (DWF/JJK), 2010 WL 3396918, at *6 (D. Minn. July 23, 2010) (Keyes, Mag. J.), *adopted by* 2010 WL 3396921 (Aug 23, 2010) (Frank, J.). "This, however, is not the standard for deciding whether Plaintiff's constitutional rights have been violated. Rather, the proper question is whether in the particular circumstances of Plaintiff's case, prison officials had legitimate reasons to apply the governing regulation, independent of whether the regulation was ultimately deemed violated." *Id.* (internal quotation marks omitted). Thus, "[i]n . . . a motion for summary judgment, the question is whether a jury could reasonably conclude that prison officials acted unreasonably in applying the DOC policy . . . in light of the asserted penological interests." *Id.* (internal quotation marks omitted). To that end, "[t]he **burden** . . . **is not** on the [Defendants] to prove the validity of prison regulations **but on the prisoner to disprove it**." *Overton*, 539 U.S. at 132. (emphasis added).

### i.     Contraband Policy 301.030

Defendants assert three primary interests that are promoted by Contraband Policy 301.030: "[possession of] materials would undermine sex-offender rehabilitation, would create a hostile work environment for prison staff, and would threaten the safety and security of DOC facilities." (Defs.' Mem. in Supp. of Mot. for Summ. J. at 13); *see also* (Affidavit of Mary McComb, "McComb Aff.") [Doc. No. 99 ¶¶ 13–15]. Previously, courts in this Circuit have established the constitutionality of prior versions of the Contraband Policy 301.030 prohibiting nudity and sexually explicit materials as a form of contraband on the basis of numerous challenges to the policy. *See, e.g.*, *Hodgson v. Fabian*, 378 F. App'x 592 (8th Cir. 2010) [hereinafter *Hodgson I*]; *Hodgson v. Roy*, No. 11-cv-243 (JNE/FLN), 2012 WL 3065386 (D. Minn. July 27, 2012) (Ericksen, J.) [hereinafter *Hodgson II*]; *Smith v. Fabian*, No. 10-cv-2193 (JRT/TNL), 2012 WL 1004982 (D. Minn. Mar. 26, 2012) (Tunheim, J.), *adopting sub nom. Smith v. Roy*, 2012 WL 1004985 (Jan. 25, 2012) (Leung, Mag. J.); *Wickner*, 2010 WL 3396921; *Baasi v. Fabian*, No. 09-cv-781 (PAM/RLE), 2010 WL 924384 (D. Minn. Mar. 11, 2010) (Magnuson, J., adopting report and recommendation of Erickson, C. Mag. J.). In each instance, the constitutionality of the policy was upheld under the *Turner* analysis. *See generally id.*

That being said, Contraband Policy 301.030 has changed over time. For example, the court in *Smith* characterized Contraband Policy 301.03 as follows:

Policy 301.030 defines sexually explicit materials as:
(1) all materials that contain pictorial depictions of sexual activity;
(2) published materials featuring nudity or written depictions of sexual activity, unless such depictions illustrate medical, educational, or anthropological content;
(3) non-published materials that contain pictorial depictions of nudity (including but not limited to pictures, photographs, internet printings, and drawings); and
(4) non-published materials containing written depictions of sexual activity that, based on an individualized review, are determined to constitute a risk to the safety and security of the facility, facilitate criminal activity, or undermine offender rehabilitation; but

(5) excluding materials issued by facility treatment staff to an offender currently participating in a sex offender treatment program.

> Nudity is defined as:
>> the showing (including a see-through covering) of human male or female genitals, anus or pubic area or the showing (including a see-through covering) of the female breast or a substantial portion of the breast below the top of the nipple. Examples of see-through coverings that are not permitted include 'pasties,' lace, mesh, and body paint through which the covered area is showing.
>
> Any single photograph containing nudity is contraband. Publications are generally only contraband if they 'feature' nudity, such as containing a large number of nude images or highlighting nude images on the front cover.
>
> Published written descriptions of sexual activity are contraband when the publication's main subject matter is sexual in nature and most, if not all, of the content contains repeated and lengthy descriptions of sexual activity.

*Smith*, 2012 WL 1004982 at *1–2 (citations omitted). The current version of Contraband Policy

301.030 defines contraband as:

> Published and non-published materials (books, magazines, photos, drawings, etc.)
>> a)      Pertaining to martial arts, gang related material, weapon and bomb making, and escape related material; or
>> b)      Featuring tattooing, nudity, or sexually explicit written content where the central theme of the item promotes contraband or prohibited content.

(Ex. A, Attached to McComb Aff.) [Doc. No. 99-1]. The policy's current definition of sexually

explicit materials is:

> materials where the central theme of the item promotes contraband or prohibited content (published or non-published) containing any pictorial display or written descriptions of:
> - direct physical stimulation of unclothed genitals,
> - masturbation,
> - sexual intercourse (including vaginal, oral, anal, or bestiality),
> - bodily fluids,
> - flagellation or torture in a sexual context, and
> - sex-related materials determined to constitute a risk to the safety and security of the facility, facilitate criminal activity, or undermine offender/resident rehabilitation.

(*Id.*). And nudity is defined as:

> the showing (including see-through covering) of human male or female genitals, anus or pubic area or the showing (including see-through covering) of the female breast or a substantial portion of the breast below the top of the nipple. Examples of see-through coverings that are not permitted include 'pasties,' lace, mesh, and body paint through which the covered area is showing; coverings emphasizing the depiction of human genitals; or tight-fitting clothing through which the contours of the genitals are clearly visible. This definition does not include published material containing nudity illustrating medical, educational or anthropological content.

(*Id.*).

This Court notes that Contraband Policy 301.03 has changed very little. Importantly, the definitions of what constitutes contraband generally and what constitutes nudity specifically are essentially the same. With respect to nudity, the current Contraband Policy 301.030 includes exceptions for "published material containing nudity illustrating medical, educational or anthropological content," but is otherwise identical to the nudity definition at issue in *Smith*. *See* 2012 WL 1004982 at *1–2. Furthermore, the current Contraband Policy 301.030's definition of what is "sexually explicit" is more well-defined but otherwise comports with the definition in *Smith*, which addressed "sexually explicit" as pertaining generally to depictions of sexual activity. *Compare id., with* (Ex. A, Attached to McComb Aff.). Prow's arguments in support of his challenge to the constitutionality of Contraband Policy 301.030 are unpersuasive in light of the weight of authority upholding the validity of Contraband Policy 301.030 and the *de minimis* changes that have occurred after those decisions. *See Hodgson I*, 378 F. App'x 592; *Hodgson II*, 2012 WL 3065386; *Smith*, 2012 WL 1004982; *Wickner*, 2010 WL 3396921; *Baasi*, 2010 WL 924384.

First, as mentioned above, many of Prow's arguments set out to "prove" the unconstitutional nature of Contraband Policy 301.030 on the basis of his disagreement with the

Defendants' professional judgment. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 10–23); (Pls.' Resp. to Mot. for Summ. J. at 2–13). But as stated elsewhere, this does not comport with this Court's duty to determine whether "prison officials had legitimate reasons to apply the governing regulation, independent of whether the regulation was ultimately deemed violated." *Wickner*, 2010 WL 3396918 at *6; *see also Beard*, 548 U.S. at 528 ("In respect to [matters of professional judgment], our inferences must accord deference to the views of prison authorities."). As a result, these arguments provide no basis for finding a violation of Prow's First Amendment rights as a matter of law. *Cf. Wickner*, 2010 WL 3396918; *see also Overton v. Bazetta*, 539 U.S. at 132 (stating that it is Prow's burden to disprove the validity of the challenged regulation).

Second, many of the arguments that Prow currently raises in support of his challenge to Contraband Policy 301.030 were addressed to varying degrees by other courts in this district when upholding the constitutionality of Contraband Policy 301.030. For example, Prow asserts that the policy is unconstitutionally vague. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 19). In *Smith*, Judge Leung found:

> A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application. Smith has not explained how the policy would require one to guess at its meaning, other than to suggest wearing a swimsuit or lingerie is not consistent with the concept of nudity. The MNDOC definition of nudity, however, expressly includes see-through coverings that expose genitals, the pubic area, the anus, the female breast or a substantial portion of the breast below the nipple. The regulation is not vague because a person of common intelligence would understand that see-through swimsuits or lingerie would fall within this definition.

2012 WL 1004985, at *7 (internal quotation marks omitted). Here, the challenged policy is not vague because a person of common intelligence would understand what falls within the definition of nudity and sexual explicit material. By that same measure, a person of common

intelligence would also understand whether the "central theme of the item promotes contraband or prohibited content." *See* (Ex. A, Attached to McComb Aff.).

Another example, not specifically raised by Prow but implicated in his submissions to the Court, is that Defendants violated Prow's First Amendment rights by requiring that he be enrolled in an art course to be granted an educational exclusion under Contraband Policy 301.030. *See* (Exs. 103–04, Attached to Prow's First Decl.) [Doc. No. 64-32] (grievances—also known as kites—sent by Prow to Defendants demonstrating Prow's displeasure with certain "educational" books being confiscated under the policy because Prow was not enrolled in a class). *Baasi* specifically addressed the same question and found the requirement to be reasonable. 2010 WL 924384, at *14 (Erickson, C. Mag. J.) ("Given the purposes behind DOC [Contraband Policy] 301.030, we find nothing unreasonable about a requirement that a prisoner be a serious student of anthropology, or medicine, or some other educational pursuit, in order to have access to sexually explicit materials in the confines of a prison. Most any prisoner can claim to be a serious student of the arts, or of the sciences, if the reward is to possess sexually explicit materials that would otherwise be denied to him or her, for the very reasons that prompted the promulgation of the contraband policy in the first instance."). In the same case, Judge Magnuson stated:

> Further, even if the enrollment requirement was not an 'official' prison policy, Baasi's argument still fails. A violation of prison policy is not sufficient to state a § 1983 claim. *See Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997); *Moore v. Schuetzle*, 486 F.Supp.2d 969, 989 (D.N.D. 2007). Section 1983 liability only arises if there is a violation of Baasi's constitutional rights. Thus, Baasi must show that Defendants' application of the prison regulation is unreasonably restrictive of his First Amendment rights. The R & R sets forth a well-reasoned and thorough explanation of why the challenged policy does not violat[e] Baasi's constitutional rights, and the Court agrees with the R & R's analysis.

*Baasi*, 2010 WL 924384, at *2.

13

Prow's other arguments challenging the constitutionality of Contraband Policy 301.030 are also unavailing. For example, Prow asserts there is no rational connection between Contraband Policy 301.030 and legitimate penological interests by making perfunctory arguments regarding whether the banned materials can create a hostile work environment. *See* (Pls.' Resp. to Mot. for Summ. J. at 10). These arguments are meritless. As Judge Tunheim noted in *Smith*, "sexually explicit material facilitates a hostile work environment for staff." *2012 WL 1004982*, at *6 (citing *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc) ("[T]here is no doubt that protecting the safety of guards in general is a legitimate interest, and that reducing sexual harassment in particular likewise is legitimate.")). Judge Tunheim further stated:

> These allegations are unsupported by the record. McComb's affidavit establishes that inmates have made comments about how female staff compare to sexually explicit images, that inmates have used images to engage in sexual misconduct in front of female staff and to sexually harass female staff, and that staff have complained about the sexually explicit materials to which they are exposed in the workplace. Smith's unsupported objections to this information do not raise a genuine question of material fact.

*Id.* (citations omitted). Here, Prow asserts similar unsupported conclusions with respect to the hostile work environment created vis-à-vis the potential dissemination of sexually explicit materials. *See* (Pls.' Resp. to Mot. for Summ. J. at 10). Like in *Smith*, Defendant McComb's affidavit establishes the manner in which these sexually explicit materials can contribute to a hostile work environment. *See* (McComb Aff. ¶ 15) ("Prison staff regularly search cells and mail and encounter explicit images in the process. Staff, both men and women, have complained about the regular exposure that they have to offensive images. In addition, offenders view sexually explicit materials and then make comments about how female staff compare to the images. Offenders also use the images to engage in sexual misconduct in front of female staff and to sexually harass female staff. All of this creates a hostile work environment for the prison

staff who must work with offenders every day."). The record does not support Prow's arguments and does not establish a genuine issue of material fact. *See Holden*, 663 F.3d at 340 ("Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact.").

Prow also alleges that Contraband Policy 301.030 fails under *Turner* because there are alternatives that would address Defendants' concerns. *See, e.g.*, (Prow's Mem. in Supp. of Mot. for Summ. J. at 15–16); (Pls.' Resp. to Mot. for Summ. J. at 9, 10–11). Prow must "point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests . . . ." *Turner*, 482 U.S. at 91. Here, Prow has not provided any evidence, and instead relies on conclusory statements that "adopt[ing] a previous version of [the] policy" is "a very simple alternative." (Prow's Mem. in Supp. of Mot. for Summ. J. at 16). Importantly, this "simple alternative" does not take into consideration the state-wide changes that would need to occur in each correctional facility maintained by the DOC. In other words, Prow's conclusory statements cannot support that this alternative is "at *de minimis* cost" to Defendants' legitimate penological interests. Judge Tunheim was confronted with similar arguments in *Smith* and concluded "there is no evidence that a less restrictive definition of 'nudity' would achieve Defendants' goals of decreasing the bartering of images and sexual harassment . . . ." 2012 WL 1004982, at *6.

Prow's arguments asserting that Contraband Policy 301.030 is not content neutral are likewise unpersuasive. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 16–19); (Pls.' Resp. to Mot. for Summ. J. at 5). It is well-settled that when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*."

*Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989). Thus, Prow's attempts to draw distinctions between the works of "Venus de Milo" and "Vampira" on the basis of his subjective determinations of what is a "non-arousing" statue is inconsequential to a determination of whether these distinctions were drawn "on the basis of their potential implications for prison security." Indeed, McComb establishes that safety and security concerns are the touchstone of Contraband Policy 301.030's prohibition. *See* (McComb Aff. ¶ 31) (stating "even though these images [of "David" and "Venus de Milo"] technically violate the policy, I would grant an exception to the policy and allow their delivery" because they are famous works of art and therefore do not pose a risk to prison security). As a result, Contraband Policy 301.030 is neutral for the purposes of Prow's challenge. *Cf. Thornburgh*, 490 U.S. at 415–16.

In light of Defendants' approach to allow certain works of art despite technically violating the Contraband Policy 301.030, Prow also asserts the policy is arbitrary. *See, e.g.*, (Prow's Mem. in Supp. of Mot. for Summ. J. at 13–14) (citing *Couch v. Jabe*, 737 F. Supp. 2d 561, 568 (W.D. Va. 2010)). Prow's reliance on *Couch* is misplaced. First, Defendants are afforded some flexibility in the manner in which they manage prison life. *See Sandin v. Connor*, 515 U.S. 472, 482–83 (1995) (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment" and "[s]uch flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life"). Second, the court in *Couch* found the nexus between maintaining security and the challenged policy too attenuated because "it is unlikely that a cogent argument could be advanced which would explain how a regulation . . . forbids James Joyce's Ulysses, but permits Hugh Hefner's Playboy. . . ." *Couch*, 737 F. Supp. 2d at 567. This is not a situation where Contraband Policy 301.030 forbids pictures of "David" or "Venus de Milo" but allows images found in Playboy. *See, e.g.*,

(McComb Aff. ¶ 31). All are deemed to violate Contraband Policy 301.03, but images of "David" and "Venus de Milo" do not trigger the same security concerns as other contraband because "David" and "Venus de Milo" are "famous works of art." (*Id.*). Thus, an attack on the "arbitrary" nature of Contraband Policy 301.030 on the basis of the rationale espoused in *Couch* is unpersuasive; there is a cogent argument establishing a rational relationship between maintaining security and the exceptions Defendants make with respect to certain materials deemed to have technically violated the policy.

As stated above, at bottom, the Court is charged with determining "whether a jury could reasonably conclude that prison officials acted unreasonably in applying the DOC policy . . . in light of the asserted penological interests." *Wickner*, 2010 WL 3396918 at *6. In view of the proffered arguments and the exhibits before the Court, this Court concludes that no reasonable jury could find that Defendants acted unreasonably in their application of Contraband Policy 301.030 in light of their asserted penological interests. *See, e.g.*, (Exs. J-1 to J-3, Attached to McComb Aff.) [Doc. Nos. 99-7 to 99-9] (pages from Martin de Diego Sádaba, Biomech Art: Surrealism, Cyborgs and Alien Universes (2001), most of which contain images of women with exposed breasts or genitalia as prohibited by Contraband Policy 301.030); (Exs. 17, 37–38, 63, 77, Attached to Prow's First Decl.) [Doc. Nos. 64-17, 64-30, 64-31] (additional examples of images of women with exposed breasts or genitalia).

This conclusion is further supported given the deference that must be given to prison officials in the day-to-day operation of their facilities. *See, e.g.*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987) (holding that "[w]e . . . reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on . . . difficult and sensitive matters of institutional administration" (internal quotation marks omitted)); *Block v. Rutherford*, 468 U.S.

576, 588 (1984) (stating that "we are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities" (internal quotation marks omitted)); *Hosna v. Groose*, 80 F.3d 298, 303 (8th Cir. 1996) (stating that "it is not the role of federal courts to micro-manage state prisons"). As a result, Defendants' Motion for Summary Judgment should be granted with respect to Prow's First Amendment challenge to Contraband Policy 301.030.

### ii.    Hobby Craft Policy 204.047

Prow has not asserted—and this Court cannot independently identify—any cases that suggest that an inmate has a constitutionally protected right to express himself in any manner that he so chooses. *But see Overton*, 539 U.S. at 135 ("Alternatives . . . need not be ideal, however; they need only be available."); *Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228, 234 (D.C. Cir. 2003) (stating the right asserted is not expression on the basis of the "appellants' preferred medium", but rather "must . . . be broadly limned to include, at a minimum, all forms of . . . expression"). Without a complete prohibition against self-expression, the case law suggests that hobby craft restrictions generally cannot rise to a constitutional violation. *See Grant v. Riley*, No. 89 Civ. 0359, 1993 WL 485600, at *2 (S.D.N.Y. Nov. 24, 1993) ("[T]he First Amendment does not provide recourse for damages every time a prisoner-artist is hindered from expressing himself through his art."); *accord Overton*, 539 U.S. at 135; *Kimberlin*, 318 F.3d at 234; *see also Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1001 (D. Minn. 2014) (Kyle, J.) ("[T]here are some injuries so de minimis that they do not rise to the level of [a] constitutional violation."). In the interest of thoroughness, however, this Court applies the *Turner* factors and

concludes that Defendants' Hobby Craft Policy 204.047 does not violate Prow's First Amendment rights.

The first *Turner* factor weighs in favor of Defendants. There is nothing to suggest that these regulations are content-based restrictions. For example, Prow provides no evidence that the challenged hobby craft restrictions were enacted because Defendants are antagonistic to the message that Prow's expression conveys. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content neutral so long as it is **justified** without reference to the content of the regulated speech." (emphasis in original) (internal quotation marks omitted)). Perhaps more importantly, as stated elsewhere, "regulations are 'neutral' in the technical sense" when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security." *Thornburgh*, 490 U.S. at 415–16. Defendants assert that the regulations are rationally related to prison security because the regulations are designed to reduce the potential influx of contraband. (Defs. Mem. in Supp. of Mot. for Summ. J. at 24); *see also* (Aff. of Sandra O'Hara, "O'Hara Aff.") [Doc. No. 58 ¶¶ 5–6].

Prow does not suggest that prison security is not a legitimate interest. Prow instead argues—based at least in part on restrictions in past regulations—the current regulations are arbitrary or otherwise irrational. (Prow's Mem. in Supp. of Mot. for Summ. J. at 26–27, 29–31). For example, Prow asserts that because incidents that the current regulations mitigate did not occur under past regulations, the current regulations are irrational or an exaggerated response to Defendants' legitimate security interests. *See, e.g.*, (Prow's Mem. in Supp. of Mot. for Summ. J. at 30) ("No fire had ever occurred, and even if water-mixable oil paints were flammable, which there are not, there could be no rational belief there is any likelihood of a fire event."). But, "[t]o

show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (citing *Thornburgh*, 490 U.S. at 417); *see also Brown v. Johnson*, 743 F.2d 408, 413 (6th Cir. 1984) (stating "prison officials, when making these types of decisions, need not demonstrate an **actual** danger in order to support the reasonableness of their determinations"). Instead, "[i]t is enough to show that a **potential** danger exists without the restrictions of a challenged prison regulation." *Brown*, 743 F.2d at 413.

Here, Defendants tailored their regulations with respect to the prohibition of water-mixable oil paints according to potential safety risks.

> In addition to the risks created by the additional screening that would be required for these special order items, I have concerns about the safety risk posed by several of the items on the list. For example, several of the items on Prow's list could create a fire hazard. Water-mixable oils pose a risk because they contain flammable ingredients and are a fire hazard.

(O'Hara Aff. ¶ 6); *see also* (Defs.' Mem. in Supp. of Mot. for Summ. J at 28) (stating water-mixable oil paints were initially banned because "paints in this class contain linseed oil which could be flammable" (citations omitted)); (Ex. A, Attached to Aff. of Wayne Niles) [Doc. No. 96-1] (office memorandum and associated exhibits memorializing the potential danger of water-mixable oil paints). Once Defendants were able to reevaluate the safety risks associated with these items, they loosened the restrictions to comport with this new information. (Aff. of Wayne Niles, "Niles Aff.") [Doc. No. 96 ¶¶ 6–7]; *see also* (Ex. 83, Attached to Prow's First Decl.) [Doc. No. 64-31] (e-mail from DOC employee Mike Lochner to O'Hara enumerating water-mixable oil paints that do not include linseed oil and should be allowed under Hobby Craft Policy 204.47). In light of the evidence presented, Defendants' stated penological interests, and the

deference due these interests, this Court finds the hobby craft restrictions have valid and content neutral-connections to their proffered penological interests

The second *Turner* factor also weighs in favor of Defendants. It is undisputed that alternatives are available. *See* (O'Hara Aff. ¶¶ 3–4); (Ex. B, Attached to O'Hara Aff.) [Doc. No. 58-1 at 28–29] (detailing the hobby craft items available for purchase in the cantina).[8] In fact, Prow's central argument is not that he is prevented from expressing himself—but only that the manner in which he is allowed to express himself with the alternatives is not ideal. *See, e.g.*, (Pls.' Resp. to Mot. for Summ. J. at 14) ("[P]risoners have access to only twelve low-grade colored pencils."); (*id.* at 22) (arguing that because the alleged violation is one based on expression the violation necessarily embraces a breadth of expressive options). A prison's denial of an inmate's access to preferred mediums is not cognizable under the First Amendment. *See, e.g.*, *Overton*, 539 U.S. at 135; *Kimberlin*, 318 F.3d at 234.

The third *Turner* factor is likewise in Defendants favor. For example, Defendants assert that these regulations are designed to prevent contraband from entering prison facilities and that increasing the items that must be reviewed also increases the risk of contraband making its way into the prison system. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 22–23); (O'Hara Aff. ¶¶ 5–6). Also, as noted above, potential changes to the hobby craft restrictions are applicable state-wide. As a result, Defendants have at least implied that a state-wide change to hobby craft restrictions would require a non-trivial increase in resource expenditures related to preventing the influx of contraband to compensate for an increase in the number of items to be reviewed on a state-wide basis. Therefore, the impact of accommodation suggests a reasonable relationship between the challenged regulation and Defendants' stated security interest. *See Spence v.*

---

[8]    For exhibits attached to the O'Hara Affidavit, CM/ECF pagination is used.

*Farrier*, 807 F.2d 753, 755 (8th Cir. 1986) ("[P]rison administrators are accorded 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979))).

The fourth factor under *Turner* also supports the constitutionality of the challenged regulation. Here, Prow provides alternatives, but no evidence of their *de minimis* cost. For example, Prow suggests that Defendants implement "policies of other states," generate a list of restrictions instead of the implemented allowable-item list, or return to previous versions of the hobby craft policy that Prow deemed more appropriate. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 34). Prow's recitation of superficial suggestions does not satisfy his burden; without some evidence suggesting that these alternatives could be implemented at *de minimis* cost, Prow arguments do not rise to a dispute over genuine issues of material fact. *See* Fed. R. Civ. P. 56(c)(1)(B); *Holden*, 663 F.3d at 340.

For example, Defendants provide evidence that these limitations are in place to reduce the workload on facility mailroom and property staff in the screening required to prevent contraband from falling into the possession of the inmates. *See* (O'Hara Aff. ¶¶ 5–6). Furthermore, this change in standards would apply to all Minnesota facilities. This leads to the inference, therefore, that Prow's suggestions—be it implementing policies from other states, migrating to a list of restrictions instead of a list of allowable items, or rolling back the regulations to a previous version—would not have a *de minimis* cost to prison security. As a result, this factor further supports a reasonable relationship between the challenged regulation and Defendants' security interest.

In sum, Hobby Craft Policy 204.047 satisfies all four factors under *Turner*, and this Court concludes the policy "is reasonably related to legitimate penological interests" and is constitutional. *See Turner*, 482 U.S. at 89. In further support of its determination, this Court notes that other district courts in other circuits have found that restriction on hobby crafts or art supplies do not violate the First Amendment. *See, e.g.*, *Tarselli v. Harkleroad*, No. 10-1266, 2012 WL 603219, at *11 (W.D. Pa. Feb. 23, 2012) (holding that "the balancing test required under *Turner* clearly supports a finding that the confiscation of Plaintiff's art related items, both governed and not governed by the art permit, did not violate Plaintiff's First Amendment rights"); *Grant*, 1993 WL 485600, at *2 (holding that "[b]ecause the First Amendment does not guarantee an absolute right for people to express themselves at any place, at any time, and in any way that they want, plaintiff was denied no right when he failed to receive the art supplies or frames in question" (citations omitted) (internal quotation marks omitted)).

### iii.     Mail Policy 302.020

Here, the first *Turner* factor weighs in favor of the regulation. Defendants assert that the application of postage to SASEs became onerous and impacted Defendants ability to effectively perform other more important mailroom duties. *See, e.g.*, (McComb Aff. ¶¶ 6–7, 34, 42). "[T]he effective management of the detention facility . . . is a valid objective . . . ." *Bell*, 441 U.S. at 540. There is a rational relationship to this proffered objective; limiting access to a time-consuming activity in furtherance of improving efficiency in the mailroom is strongly correlated to the concept of effective management of the detention facility. Furthermore, Defendants assert that "[t]he policy applies regardless of the content or the purpose of the envelope." (Defs.' Mem. in Supp. of Mot. for Summ. J. at 30–31) (citing McComb Aff. ¶ 42). Thus, Mail Policy 302.020 appears to be content-neutral and rationally related to a legitimate penological interest.

The second *Turner* factor is also met because alternatives exist. For example, "[t]he person sending the envelope back may apply their own postage to letters and other mailings that they wish to send or inmates can arrange to have friends and family in the community send an addressed stamped envelope to the sender." (Defs.' Mem. in Supp. of Mot. for Summ. J. at 31); *see also* (Prow's Mem. in Supp. of Mot. for Summ. J. at 39) (stating that prisoners can alternatively "reimburse the recipient" though a purchase voucher). Prow argues these alternatives are not ideal, because "[t]he point is to prepay the postage for the recipient." (Prow's Mem. in Supp. of Mot. for Summ. J. at 37). But inmates do not have a constitutional right to pay for postage. What is protected is their freedom of expression; the question is whether there are alternatives to restrictions in this context. In this regard, the touchstone is not whether an alternative is ideal, but merely whether one exists. *See Overton*, 539 U.S. at 135 ("Alternatives . . . need not be ideal; however, they need only be available."). Importantly, Prow does not suggest that the regulation in light of available alternatives prevents inmates from receiving **all** correspondences or even a vast majority of correspondences. In fact, Prow's own statement that he is able to receive mail in question through a purchase voucher suggests that **no** mail is affected by this prohibition. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 39) (stating "the only alternative which works for prisoners . . . is to reimburse the recipient for postage").

Prow raises additional arguments challenging the constitutionality of Policy 302.020. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 37–39); (Pls.' Resp. to Mot. for Summ. J. at 25–28). Of these arguments, this Court is most concerned with Prow's allegations that the prohibition of SASEs impedes access to Minnesota courts because it prevents service of process under Minnesota Rules of Civil Procedure 4.05. *See* (Prow's Mem. in Supp. of Mot. for Summ.

24

J. at 38). This argument, however, is unhelpful to Prow's constitutional challenge for a number of reasons. First, Defendants have demonstrated that there is an exception to the general prohibition against SASEs for this purpose. *See* (Ex. AA, Attached to McComb Aff.) [Doc. No. 100-9] (memorandum to inmates stating "[t]he sole exception to this is an offender who is serving a lawsuit by mail in compliance with the Minnesota Rules of Civil Procedure"); *see also* (McComb Aff. ¶ 41) ("Exceptions to the ban are made in special circumstances such as for college applications or if an offender is serving a lawsuit by mail in compliance with the Minnesota Rules of Civil Procedure."). Prow's assertion that this exception is not "official" policy is unpersuasive. Importantly, Prow has not suggested to the Court that he was prevented access to Minnesota courts on the basis of Defendants' failure to honor this exception.

Second, because it does not appear that Prow has attempted (or is even contemplating) service of a lawsuit by mail pursuant to the Minnesota Rules of Civil Procedure, Prow cannot claim that he is harmed by this provision in this respect. Instead, all Prow has are speculative arguments that Mail Policy 302.020 "makes it impossible for prisoner litigants to use the most common and effect method of service." (Prow's Mem. in Supp. of Mot. for Summ. J. at 38). Without some showing of a real or immediate threat of being denied access to the courts, this argument cannot support a finding that Mail Policy 302.020 is unconstitutional. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (stating speculative claims cannot support constitutional violations). As a result, there is no evidence showing that Defendants proffered alternatives impermissibly limit Prow's exercise of his constitutional rights, and this factor weighs in favor Mail Policy 302.020's constitutionality.

The third *Turner* factor also weighs in favor of Defendants. As discussed above, Defendants aver that the application of SASEs reduces the time that staff can devote to other

mailroom duties, such as "screening incoming mail for contraband." (Defs.' Mem. in Supp. of Mot. for Summ. J. at 31). Prisons have a vested interest in screening for contraband to protect the safety and security of its inmates and staff, and this factor weighs in favor of Mail Policy 302.020's constitutionality.

The fourth *Turner* factor also suggests Mail Policy 302.020 is constitutional. For example, Prow argues in various ways that Defendants' proffered arguments are either disingenuous or fabrications. *See, e.g.*, (Pls.' Resp. to Mot. for Summ. J. at 25–27). But this is insufficient to support Prow's burden demonstrating alternatives "that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests . . . ." *Turner* 482 U.S. at 91. Therefore this Court finds this factor weighs in favor of Mail Policy 302.020's constitutionality.

In sum, this Court concludes that the challenged restrictions to Mail Policy 302.020 are valid under *Turner* and—as a matter of law—no reasonable jury could find otherwise. As a result, this Court recommends that Defendants' Motion for Summary Judgment be granted in this regard.

**b.    Eighth Amendment Claims**

Prow does not directly allege constitutional violations arising under the Eighth Amendment. *See generally* (Am. Compl.). Prow explicitly disclaims any claims arising under the Eighth Amendment in his memorandum in support of summary judgment, likely in response to Defendants arguments in their own memorandum in support of summary judgment. *Compare* (Defs.' Mem. in Supp. of Mot. for Summ. J. at 34–35) (stating that Prow has failed to allege an Eighth Amendment violation "[t]o the extent that he may be attempting to assert a conditions-of-confinement claim"), *with* (Prow's Mem. in Supp. of Mot. for Summ. J. at 8) (unequivocally stating that Prow voluntarily dismisses claims arising under the Eighth Amendment). Because

26

the Court cannot identify an asserted Eighth Amendment claim in Prow's Amended Complaint, Defendants' request for summary judgment directed thereto should be denied as moot.

### c.    Fourteenth Amendment Claims

Prow's claims under the Fourteenth Amendment can be categorized as general allegations that Defendants did not follow proper policy or procedures. *See* (Prow's Mem. in Supp. of Mot. for Summ. J. at 24) (allegeing that "[l]ying and misrepresentation is not authorized by policy"); (*id.* at 27) (asserting that "[p]olicy requires that the chair of the committee to distribute and ensure that all policy revision requests are properly processed" and alleging that she did not do so); (*id.* at 36) (asserting that "the appeal was per policy supposed to be decided by [Hillyard's] superior" but that "Hillyard replied to the appeal himself"). Prow's only identifiable claim under the Fourteenth Amendment, construing his claims liberally, is a procedural due process claim.

"A procedural due process claim is reviewed in two steps. The first question is whether [Prow] has been deprived of a protected liberty or property interest. Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (citations omitted) (internal quotation marks omitted). Only if the Court determines the existence of a protected interest does it

> consider what process is due by balancing the specific interest that was affected, the likelihood that the . . . procedures would result in an erroneous deprivation, and the . . . interest in providing the process that it did, including the administrative costs and burdens of providing additional process.

*Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976)). Arguably, there is no protected liberty interest on the basis of Prow's allegations because "there is no § 1983 liability for violating prison policy." *Gardner*, 109 F.3d at 430. Even if Prow's allegations raised more

compelling claims under the Fourteenth Amendment, the record shows that Prow's procedural due process rights were not violated.

Importantly, the record does not demonstrate a lack of procedures to protect Prow's interest. *See Bd. of Regents v. Roth*, 408 U.S. 564, 570–71 (1972). "[N]otice of the factual basis leading to" a deprivation of rights and "a fair opportunity for rebuttal" are considered "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005). Here, Prow filed numerous kites, related appeals, and other requests asking for reconsideration of the confiscation of various items and suggesting changes to policy. *See, e.g.*, (Exs. 29, 68, 72, 74, 97–99, 102–04, Attached to Prow's First Decl.) [Doc. Nos. 64-29, 64-31, 64-32]. Some of Prow's efforts seemed to have borne fruit; regulations regarding certain water-mixable oil paints were relaxed after it was determined that not all water-mixable oil paints are a safety and security risk. *See* (Niles Aff. ¶¶ 6–7); *see also* (Ex. 83, Attached to Prow's First Decl.) [Doc. No. 64-31] (e-mail from DOC employee Mike Lochner to O'Hara enumerating water-mixable oil paints that do not include linseed oil and should be allowed under Hobby Craft Policy 204.47). The record shows that Prow was informed of the factual basis leading to confiscation of materials and that he was given a fair opportunity to appeal these confiscations. Thus, this Court concludes as a matter of law that no reasonable jury could find that Prow's procedural due process rights were violated and Defendants are entitled to summary judgment regarding this claim.

### d.    Qualified Immunity

Even if Prow's allegations raised genuine issues of material fact—which they have not on the basis of the above analysis—Defendants would be entitled to qualified immunity. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly

unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton* 483 U.S. 635, 639 (1987) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted) (internal quotation marks omitted). Here, Prow's subjective belief that Defendants violated his constitutional rights and that he informed them of such is largely inconsequential to the qualified immunity analysis. *See, e.g.*, (Prow's Mem. in Supp. of Mot. for Summ. J. at 5–6). What matters is whether Defendants actions were reasonable in light of pre-existing law. Under this rubric, this Court concludes that Defendants actions were reasonable.

First, as described elsewhere, the constitutionality of Contraband Policy 301.030 has been upheld numerous times. *See Hodgson I*, 378 F. App'x 592; *Hodgson II*, 2012 WL 3065386; *Smith*, 2012 WL 1004982; *Wickner*, 2010 WL 3396921; *Baasi*, 2010 WL 924384. Defendants actions enforcing Contraband Policy 301.030 were objectively reasonable based on their understanding of the constitutionality of this policy.

Second, with respect to Hobby Craft Policy 204.047, as described elsewhere, it is well-settled that Prow does not have a constitutional protected right to his choice of expressive medium. *See Overton*, 539 U.S. at 135; *Kimberlin*, 318 F.3d at 234. Furthermore, the restrictions placed on certain hobby craft items were premised on Defendants' security interests. *See* (O'Hara Aff. ¶ 6); *see also* (Defs.' Mem. in Supp. of Mot. for Summ. J at 28) (stating water-mixable oil paints were initially banned because "paints in this class contain linseed oil which could be flammable" (citations omitted)). Consequently, Defendants' implementation and

29

enforcement of Hobby Craft Policy 204.047 was objectively reasonably given the various forms of artistic expression that Prow was afforded and the basis by which certain hobby craft items were restricted.

Third, with respect to Mail Policy 302.020, as described above, Defendants actions were objectively reasonable in light of their understanding of *Turner*. Importantly, Defendants provided numerous exceptions to what Prow has alleged is a blanket prohibition against SASEs. *Compare* (Prow's Mem. in Supp of Mot. for Summ. J. at 38–39) (stating that the exception is inapplicable because it is "unofficial"), *with* (McComb Aff. ¶ 41) ("Exceptions to the ban are made in special circumstances such as for college applications or if an offender is serving a lawsuit by mail in compliance with the Minnesota Rules of Civil Procedure."). As a result, this Court concludes that Defendants acted in an objectively reasonable manner when implementing and enforcing restrictions under Mail Policy 302.020 and exceptions directed thereto.

Fourth, with respect to Prow's due process claims, there is nothing to suggest that Defendants' acted unreasonably in light of the clearly established law surrounding grievances generally. For example, it is well-settled that "there is no § 1983 liability for violating prison policy." *Gardner*, 109 F.3d at 430. Furthermore, as discussed above, Defendants acted reasonably when they provided "notice of the factual basis leading to" and "a fair opportunity for" Prow to rebut confiscations under the challenged polices. *See Wilkinson*, 545 U.S. at 225–26.

As a result, nothing suggests that Defendants acted unreasonably and qualified immunity shields them from potential liability.

In sum, this Court recommends that Defendants Motion for Summary Judgment with respect to Prow's claims arising under the First and Fourteenth Amendment be granted. Based on

this recommendation, this Court finds that Prow is not entitled to relief as a matter of law. As a matter of law, no reasonable jury could find Defendants violated Prow's constitutional rights regarding any of his alleged claims and no reasonable jury could find that Defendants acted unreasonably in light of pre-existing law. Consequently, the Court recommends that Prow's Motion for Summary Judgment be denied.

### B.    Prow's Motion for Temporary Restraining Order

Because this Court recommends that Defendants' Motion for Summary Judgment be granted and this case be dismissed, this Court also recommends that Prow's Motion for Temporary Restraining Order be denied as moot. *Accord Njaka v. Kennedy*, No. 12-cv-2712 (JRT/JJG), 2014 WL 4954679, at *18 (D. Minn. Sept. 30, 2014) (Graham, Mag. J. as adopted by Tunheim, J.) (stating that "in light of the Court's determination as to dismissal, the motions [for preliminary injunction and temporary restraining order] should be denied as moot"); *Gamut Control LLC v. Rydberg*, No. 09-cv-913 (JNE/SRN), 2009 WL 3164433, at *2 (D. Minn. Sept. 25, 2009) (Nelson, Mag. J. as adopted by Ericksen, J.) ("In light of this Court's recommendation for dismissal of this lawsuit, the Court likewise recommends that Defendant's motions be denied as moot.").

## III.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants Roy, King, O'Hara, Hammer, McComb, Krippner, Stepney, Lindell, and Hillyard's Motion for Summary Judgment [Doc. No. 91] be **GRANTED in part** and **DENIED in part** as described herein;

2. Plaintiff Matthew Prow's ("Prow") Motion for Summary Judgment [Doc. No. 107] be **DENIED**;

3. Prow's Motion for Temporary Restraining Order [Doc. No. 115] be **DENIED as moot**; and

4. This case be **DISMISSED with prejudice**.

Dated: June 21, 2017

  *s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).